[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a summary process action alleging non-payment of rent CT Page 3422 in the first count or, in the alternative, lapse of time in the third count. The defendants entered general denials to each count and alleged three special defenses: (1) that the premises were uninhabitable; (2) that the premises contained lead paint; (3) that there was no certificate of occupancy issued for the premises.
The first issue to be resolved in the case is whether a written lease existed for a term of three years; or whether a month to month tenancy existed between the parties. If there is a written lease the plaintiffs must prove non-payment. If there is no written lease, the plaintiffs must prove the tenancy is terminable based upon lapse of time.
The court finds the following facts. The parties signed a document which they intended to be a lease agreement. They neglected to provide terms for the commencement date, and the termination date, among others. The lease form was provided by an attorney contacted by the defendants. Neither party sought or obtained any further legal review or advice. Both parties signed this purported lease. In paragraph 3 on page 3 the parties agreed that "at the end of the 3 year lease the rent may be increased." The rental amount due under the lease for the term of the lease was $25,200. That number divided by 36 months yields a monthly payment of $700 which was the amount the defendants paid. This fact was corroborated by Mr. Wooster who testified that monthly rent of $700 was payable starting on June 15, 1990. Furthermore, paragraph 6 on page 4 permits the tenants to make certain repairs to the second floor apartment while paragraph 8 on page 4 states that "(I)t is understood that the Tenant may rent (sub-let) the first floor apartment and receive all proceeds therefrom."
There was testimony that, with the plaintiffs' permission, the defendants entered upon the property and proceeded to make repairs in February, 1990. At times, the defendants deducted the amount spent on a repair from the rent payment with the plaintiffs' agreement. The defendants readied the first floor apartment and leased it to a third party and they have collected rent on it in the amount of $600 per month to the present time. They improved the second floor apartment at their own expense spending $4000. They installed new counter tops in the kitchen, installed new linoleum and carpeting, installed a new sink, faucet and ceiling fixture, and painted and wallpapered the walls. They purchased appliances which remain their property when they vacate. Photographs submitted CT Page 3423 bear witness to some of the improvements they made.
The relationship between the parties was amicable; the defendants were friends of the plaintiffs' daughter and the plaintiffs had attended their wedding in May 1990. However, it soured after November 1990. At that time, the defendants who had not always paid the rent in a timely fashion, told Mr. Wooster that they had a car repair bill and could not pay the rent on time but would send it over a period of time. Mr. Wooster agreed to "let it slide." He gave them "amnesty for that month." To that end the plaintiffs accepted partial payments of $100 in January 1991 and $25 in March toward the rental arrearage, continuing a pattern of accepting late or partial payments which had developed over the term of the tenancy. Mrs. Wooster acted as her husband's agent in collecting rent. Although she marked on each rent receipt after November 1990 the amount of the balance still due for November's rent, she did not urge her husband to terminate the tenancy but collected the partial payments because they were "due me". She did not indicate with each successive payment that the amounts were going to be first applied to the arrearage. In answer to defense counsel's question as to how she could determine from Exhibit 2 whether or not payment was made toward the November 1990 payment she said she could not because the defendants never paid it. Interestingly the checks for rent paid on February 15, 1990 and March 20, 1990 bear no memorandum as to which month the payment applied. However, on the April 15 check, Exhibit 3, check no. 912, there is written as a memorandum, "Rent April 15th." Lori Criscuolo denied that the writing of the memorandum was hers. A comparison of the word "Rent" on the check memorandum and as it appears in the plaintiffs' receipt book appear to this court to be one and the same, namely that of Mrs. Wooster. It was she, therefore, who characterized the defendants' payment as "rent" for "April." On the April stub in the receipt book the words "Rent", "Nov. 575.00 Due", and the numbers $700.00 and $575.00 appear in different colored inks made by different writing instruments so that the court concludes that these entries were made at different times.
A further complication arose when the defendants claimed that they were entitled to reimbursement for a plumbing repair bill which they incurred in November 1990. They claimed they gave the bill to Mr. Wooster, and had not retained a copy. The plaintiffs claim they never saw such a bill. The defendants apparently believed that they could expect reimbursement. Their belief may have been erroneous but was not willful.
The plaintiffs waited one year before bringing this action on the grounds of non-payment of the November 1990 rent. On November 14, 1991, the plaintiffs served the defendants with a notice to quit the premises on November 27th, 1991. CT Page 3424
The motivation for this act was Mr. Wooster's belief that he had a bad deal and his "munificence (had) been abused . . . . letting people have it for next to nothing." Mr. Wooster and his mother, now deceased, had established a rental of $315 in the summer of 1989 for the last tenants to reside there before the Criscuolos. He negotiated the rent amount of $700 for the entire house with Mr. Criscuolo. The defendants nevertheless proceeded to invest time and money into the property.
The motivation for the tenants' improvements was their belief that they had an "option" to purchase the property. Paragraph 7 on page 4 states as follows:
 Tenant further shall have an option to purchase the property during the term of this Lease or any extension thereof which shall be a first option to purchase the property. The Landlord shall communicate the purchase price to the Tenant and the Tenant shall then be given sixty (60) days to either accept or reject the Landlord's offer to purchase at that price. In the event that the Tenant accepts the offer of the Landlord their (sic)acceptance shall be in writing. Within ninety (90) days thereafter a closing shall be held. The Tenant shall be given a credit against the purchase price of 50% of any rent they have paid during the term of the Lease up to and including the closing date by the Seller.
In Maier v. Arsenault, 140 Conn. 364, 367-368, (citation omitted), the court outlined the parol evidence rule:
 It is, of course, fundamental, as a matter of substantive law, that the terms of a written contract which is intended by the parties to set forth their entire agreement may not be varied by parol evidence. (citations omitted) It is equally fundamental, however, that when the words used in a written contract are uncertain or ambiguous, parol evidence of conversations between the parties or other circumstances antedating the contract may be used as an aid in the interpretation of the contract, that is, in the determination of what was the intent of the parties which was expressed by the written words. Maltby, Inc. v. Associated Realty Co., 114 Conn. 283, 289. (other citations omitted)
The court finds that, despite the omissions in Exhibit "A", the parties conducted their affairs and tracked the provisions of the document as though it were an effective lease. In fact, Mrs. Wooster testified that once she had told the defendants that she would have to "break the lease" if they did not pay their rent on time. The parties' conversations before the document was signed manifest CT Page 3425 their intention to have a lease; their conduct subsequent to the signing of the lease confirms that a lease agreement exists.
Since a lease exists this action must be based on the claim that the tenancy was terminated for non-payment of rent in November 1990.
In their trial brief, although not in their Answer or Special Defense, the defendants raise the equitable defense of estoppel. "Estoppel "require(s) proof of misleading conduct by one party resulting in detrimental reliance by the other." Edart Truck Rental Corporation v. B. Swirsky Co., 23 Conn. App. 137, 141. Here, although the plaintiffs indicated on the rent stubs that back rent was due for November, the failure by the plaintiffs to bring a summary process action earlier than one year later and the fact that the plaintiffs never gave the defendants a deadline for paying the balance due led the defendants to rely on the pattern of informal dealings they had enjoyed with the plaintiffs.
In Fellows v. Martin, 217 Conn. 57, 62 the court discussed the application of equitable principles where the right to possession is implicated. In that case the court said
 The tenant's answer did not raise the equitable doctrine against forfeitures as a defense to the summary process action but instead sought by way of a counterclaim the "denial of the summary process action on equitable grounds." The doctrine against forfeiture was, however, considered in principle by the trial court and briefed by the tenant. The tenant thus raised the issue below sufficiently for use to consider it upon review, particularly in light of the doctrine that once any equitable claim has been raised, the court retains its equitable jurisdiction to consider all of the equities before it in order to render complete justice . . . . at 64.
In the instant case the defendants did not brief the doctrine against forfeiture. However, this court is mindful of the Supreme Court's reasoning as discussed in footnote 8 that precluding equitable defenses where the right to possession is implicated could result in the filing of a separate action for injunctive relief. This court believes that it is more expedient to resolve the issues relating to possession in this action.
The court discussed the equitable theory that "Equity abhors . . . a forfeiture" where the lessor's loss was small, the default slight, and the hardship to the tenant great. The court noted that Connecticut Appellate and Superior Courts have applied this ancient equitable doctrine to summary process actions for nonpayment of rent, occasionally finding for the tenant on the particular facts of CT Page 3426 the case. The particular facts of this case lend themselves to equitable consideration. The lessor's loss was small, the default slight and the hardship to the tenant great. Although the arrearage was not insignificant the loss to the plaintiffs was small and the default slight in proportion to the hardship of the defendants. They had put time, labor and money into repairing and improving two apartments. It is true that, given $600 from the downstairs tenant, they only needed another $100 in order to pay their rent. However, they had expended $4000 to make capital improvements to the plaintiffs' property. The plaintiffs made their bargain and they shall eventually reap the benefit of those repairs if and when they sell the property, whether to the defendants or to a third party. The defendants, if evicted, will stand to lose the credit of 50% of the rent they paid applied to the ultimate purchase price should they successfully exercise the option. Since the lease has more than another year to run, the hardship caused by a forfeiture would be harsh and inevitable. Although not a factor in this decision, the court notes that the defendants paid the full amount of the November arrearage after the notice to quit was served.
The defendants bear the burden of proof in all three special defenses. C.P.B. sec. 164. Their chief witness, Paul Carbone, Housing Code Inspector for the city of Bridgeport, testified that the defendants made a complaint to the Health Department on November 22, 1991 reporting code violations. He further testified that corrections needed were cosmetic in nature except for a handrail but that none of the health code violations he cited rendered the premises uninhabitable. He further testified that he had no way of knowing whether there is lead paint on the premises. There was no evidence produced as to whether or not a certificate of occupancy had been issued. Accordingly, the defendants are not entitled to rent abatement for the term of the tenancy.
The court having found a written lease, lapse of time as a ground for this action is not appropriate.
For the foregoing reasons, judgment enters in favor of the defendants on both counts.
LEHENY, JUDGE